UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____ x

ROBERT J. RODAK, Individually and on       :    Civil Action No.  1:17-CV-1179 (GLS/DJS)
Behalf of All Others Similarly Situated,         :
                                                 :    CLASS ACTION
                                Plaintiff,        :
                                                 :    COMPLAINT FOR VIOLATION OF THE
            vs.                                  :    FEDERAL SECURITIES LAWS
                                                 :
THOMAS E. D'AMBRA, DAVID H.           :
DEMING, KENNETH P. HAGEN, LUIS       :
GERARDO GUTIÉRREZ FUENTES,           :
ANTHONY J. MADDALUNA, FERNANDO   :
NAPOLITANO, WILLIAM S. MARTH,        :
KEVIN O'CONNOR, FELICIA I. LADIN,    :
THE CARLYLE GROUP, L.P., CARLYLE     :
INVESTMENT MANAGEMENT L.L.C.,        :
CARLYLE PARTNERS VI, L.P., GTCR LLC, :
GTCR FUND XI/A LP, GTCR FUND XI/C     :
LP, GTCR CO-INVEST XI LP, UIC PARENT  :
CORPORATION, UIC MERGER SUB, INC.   :
and ALBANY MOLECULAR RESEARCH,       :
INC.,                                           :
                                                 :
                                Defendants.       :
_____ x    DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      This is a class action brought on behalf of former stockholders of Albany Molecular Research, Inc. ("AMRI" or the "Company").  AMRI entered into an Agreement and Plan of Merger, dated as of June 5, 2017 (the "Merger Agreement"), with UIC Parent Corporation ("Parent") and UIC Merger Sub, Inc. ("Merger Sub," and collectively, "UIC"), which were formed and are controlled by affiliates of The Carlyle Group, L.P. and Carlyle Investment Management L.L.C. (collectively, "Carlyle") and affiliates of GTCR LLC (collectively, "GTCR").  Under the Merger Agreement, AMRI's Board of Directors (the "Board") agreed to the acquisition of AMRI by Carlyle and GTCR in exchange for $21.75 per share in cash in a merger transaction (the "Merger").

2.      The Merger is a self-interested transaction in which AMRI's Chief Executive Officer ("CEO"), William S. Marth, and its Board decided to sell the Company in order to receive lucrative personal payoffs rather than allow AMRI's public stockholders to share in the Company's bright future.  The Company announced strong financial results and indicated it was positioned for an "excellent year" shortly before the Board agreed to the Merger Agreement, and it had previously indicated that it had several more years of strong growth ahead.  To the extent the Company needed cash, it had ample access to capital from the multiple firms who had expressed interest in a financing transaction.  A financing transaction would permit public stockholders to benefit from AMRI's growth.  On the other hand, a financing transaction would deprive AMRI's officers and directors of the personal payoffs available from a sale of the Company.  Accordingly, the Board decided to sell the Company.

3.      Even after making that self-interested decision, the Individual Defendants (as defined below) were apparently so eager for their payday that they prematurely ended the sales process, allowing the two strongest bidders (Carlyle and GTCR) to band together to acquire the

Company, rather than making them compete with one another and, if necessary, pairing them with parties who were less able to compete independently. As a result, the Board spurned a bidder who was willing to pay more to acquire the Company so that it could lock up the deal with Carlyle and GTCR.

4.      Having agreed to sell the Company, the Individual Defendants then had to convince stockholders to vote to approve it. That task was not necessarily going to be easy, given that another party had offered to buy the Company for $22.50 per share, that AMRI shares had previously traded as high as $23.95 per share, and that the Company was on course for significant growth and profits. Thus, in order to make the Merger price appear attractive to AMRI's outside stockholders, the defendants issued a proxy statement recommending approval of the Merger (the "Proxy Statement") that contained materially false and misleading information and omitted other material information that was necessary to make the information that was disclosed not misleading.

5.      Most notably, the financial projections contained in the Proxy Statement, and relied upon by the Board's financial advisor in opining that the Merger price was fair to stockholders, are inconsistent with the Company's true plans for growth, as shown by defendants' own prior statements. While the Company had told investors it would reach $1 billion in revenue within the next few years, the projections used to justify the Merger forecast that the Company's revenue would not have reached $1 billion even by the post-2021 "terminal year." These downwardly manipulated financial projections were central to the Proxy Statement and to the Individual Defendants' advocacy of the Merger. Projections that were honest (*i.e.*, showed higher growth) would have made clear to stockholders that they would have been better off rejecting the Merger Agreement and either continuing to own AMRI as an independent public company or holding out for a better offer.

6.     When stockholders are forced to decide whether to accept a sum certain value in a cash-out merger, there is no more material information than management's estimates of the standalone corporation's future cash flows.  In such a situation, investors are concerned, perhaps above all else, with the expected corporate cash flows if the sale is not approved.  A common refrain throughout case law states that "projections . . . are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or . . . market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects."  For these reasons, under the federal securities laws, corporate directors are obligated to provide an honest and untainted summary and description of projected future cash flows in the context of a merger.  Here, however, the Individual Defendants disclosed projected cash flows that did not reflect their own true expectations for the Company's future earnings.  The Individual Defendants thereby misled stockholders in their attempt to make the undervalued Merger appear fair.

7.     As a result of these and other materially false and misleading statements and omissions in the Proxy Statement, defendants were able to obtain stockholder approval of the sale of the Company to Carlyle and GTCR and deprive AMRI stockholders of the full value of their interest in AMRI.  On August 18, 2017, a majority of AMRI stockholders voted in favor of the Merger Agreement.  On August 31, 2017, the Merger closed.  The preparation and dissemination of the false and misleading Proxy Statement thus induced stockholder action that resulted in substantial harm to plaintiff and AMRI's other stockholders.

8.     This action is brought against AMRI, certain of its senior officers and directors and its merger partners UIC, Carlyle and GTCR arising out of defendants' dissemination of the materially false and misleading Proxy Statement in violation of §§14(a) and 20(a) of the U.S. Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 14a-9 promulgated thereunder,

17 C.F.R. §240.14a-9.  Plaintiff seeks damages individually and on behalf of other former AMRI stockholders.

## JURISDICTION AND VENUE

9.     Pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, this Court has jurisdiction over the claims arising under and pursuant to §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.

10.    Venue is proper in this District pursuant to 28 U.S.C. §1391 and §27 of the 1934 Act because defendant AMRI has its principal place of business at 26 Corporate Circle, Albany, New York.  This Court has personal jurisdiction over each defendant named herein because each defendant is an individual, corporation or partnership that has sufficient minimum contacts with this District, including by virtue of their direct involvement in the negotiations surrounding the Merger, which occurred in this District, so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## PARTIES

11.    Plaintiff Robert J. Rodak owned 500 shares of AMRI common stock before the Merger closed and was entitled to vote at the Special Meeting on the Merger.  Plaintiff is a citizen of the State of Kansas.

12.    Before the Merger, defendant AMRI was a Delaware corporation and maintained its principal executive offices at 26 Corporate Circle, Albany, New York 12203.  AMRI's common stock was traded on the NasdaqGS under the ticker symbol "AMRI."  AMRI was a global contract research and manufacturing organization that had been working with the life sciences sector and pharmaceutical industry to improve patient outcomes and the quality of life for more than two decades.  With locations in North America, Europe and Asia, AMRI had a diversified portfolio of customers, including more than 300 from large pharmaceutical companies, and biotech, specialty and adjacent spaces.  As a result, AMRI had high pipeline visibility for the future.

13.     Defendant Thomas E. D'Ambra ("D'Ambra") was a director of AMRI and served as Chairman of the Board from January 2014 at least until the closing of the Merger. D'Ambra co-founded the Company in 1991 and served as its President and CEO until 2013. D'Ambra is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

14.     Defendant David H. Deming ("Deming") was a director of AMRI from February 2016 at least until the closing of the Merger. Deming is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

15.     Defendant Kenneth P. Hagen ("Hagen") was a director of AMRI from May 2016 at least until the closing of the Merger. Hagen is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

16.     Defendant Luis Gerardo Gutiérrez Fuentes ("Gutiérrez") was a director of AMRI from July 2015 (following the Company's acquisition of Gadea Grupo Farmacéutico, S.L., of which he was founder and CEO) at least until the closing of the Merger. Gutiérrez is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

17.     Defendant Anthony J. Maddaluna ("Maddaluna") was a director of AMRI from February 2016 at least until the closing of the Merger. Maddaluna is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

18.     Defendant Fernando Napolitano ("Napolitano") was a director of AMRI from July 2016 at least until the closing of the Merger. Napolitano is identified in the Proxy Statement as a

participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

19.     Defendant William S. Marth ("Marth") was a director of AMRI and served as President and CEO of the Company from January 2014 at least until the closing of the Merger. Marth is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

20.     Defendant Kevin O'Connor ("O'Connor") was a director of AMRI from March 2000 at least until the closing of the Merger.  O'Connor is identified in the Proxy Statement as a participant in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein.

21.     Defendant Felicia I. Ladin was Senior Vice President, Chief Financial Officer ("CFO") and Treasurer of AMRI from February 2015 at least until the closing of the Merger.  As CFO, Ladin played a leading role with respect to preparation of the management projections that were disclosed in the Proxy Statement.

22.     The defendants identified in ¶¶13-21 are collectively referred to herein as the "Individual Defendants."

23.     Defendant The Carlyle Group, L.P. ("Carlyle Group") is a Delaware limited partnership.  Carlyle Group describes itself as a global alternative asset manager with $170 billion in assets under management.

24.     Defendant Carlyle Investment Management L.L.C. ("Carlyle Investment") is a Delaware limited liability company.  Carlyle Investment is a subsidiary of Carlyle Group, and it or one of its subsidiaries or affiliates serves as investment advisor for Carlyle Partners VI, L.P.

25.     Defendant Carlyle Partners VI, L.P. ("Carlyle Fund VI" and, together with Carlyle Group and Carlyle Investment, "Carlyle") is a Delaware limited partnership controlled by Carlyle

Group.  Carlyle Fund VI is a $13 billion buyout fund.  Carlyle Fund VI provided equity capital for the Merger and entered into a guarantee in favor of the Company with respect to certain obligations of Parent and Merger Sub under the Merger Agreement.

26.    Defendant GTCR LLC is a Delaware limited liability company.  GTCR LLC describes itself as a leading private equity firm focused on investing in growth companies in the financial, technology, healthcare, media and telecommunications and growth business services industries.

27.    Defendants GTCR Fund XI/A LP, GTCR Fund XI/C LP and GTCR Co-Invest XI LP (collectively, "GTCR Fund XI" and, together with GTCR LLC, "GTCR") are Delaware limited partnerships controlled by GTCR LLC.  GTCR Fund XI is a buyout fund with $3.85 billion of limited partner commitments.  GTCR Fund XI provided equity capital for the Merger and entered into a guarantee in favor of the Company with respect to certain obligations of Parent and Merger Sub under the Merger Agreement.

28.    Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

29.    Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

30.    Together, Carlyle, GTCR, Parent and Merger Sub are referred to in this complaint as the "Buyer Defendants."  Under §6.04 of the Merger Agreement, the Buyer Defendants were required to, and did, cooperate with and assist the Company in connection with the preparation of the Proxy Statement.

31.    Each of the defendants participated in the preparation, review and dissemination of the materially false and misleading Proxy Statement complained of herein.  The Individual Defendants abdicated their duty to file and distribute to plaintiff and the class a proxy statement that was not false and misleading.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff's claims are brought individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all former owners of AMRI common stock and their successors in interest, except defendants and their affiliates (the "Class").

33.     Plaintiff's claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

34.     The Class is so numerous that joinder of all members is impracticable.  According to the Proxy Statement, there were more than 43 million outstanding shares of AMRI common stock entitled to vote at the Special Meeting on the Merger.

35.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include, but are not limited to:

(a)     whether defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by preparing, reviewing and disseminating a false and misleading proxy statement; and

(b)     whether plaintiff and the other members of the Class have been damaged as a result of the conduct detailed herein.

36.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

37.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

38.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

39.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

40.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND OF THE MERGER

**The Conflicts of Interest that Tainted the Sales Process
and Incentivized Defendants to Advocate the Merger**

41.    To understand the Merger and why the defendants would mislead AMRI's stockholders in order to secure its approval, it is important first to understand the Individual Defendants' financial interests as they relate to the Merger.  Here, the Individual Defendants stood to receive significant sums of money in a few different ways if the Company were to be sold, which they would not receive in the absence of a sale.

42.    First, AMRI's officers and directors received a total of over $27.5 million in special benefits – not available to ordinary stockholders – for outstanding incentive awards, each of which became fully vested and was cashed out in connection with the Merger, but would not have been absent a sale.  Below is a table setting forth the value of these payments for each of AMRI's officers and directors:

| | Stock Options | | | RSU Awards | | PSU Awards | | Restricted Stock Awards | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Aggregate Number of Shares Subject to Outstanding Stock Options (#) | Weighted Average Exercise Price ($) | Aggregate Stock Option Payment ($) | Number of RSUs (#) | Aggregate RSU Payment ($) | Number of PSUs (#) | Aggregate PSU Payment ($) | Number of shares of Restricted Stock (#) | Aggregate Restricted Stock Award Payment ($) | Total Equity Award Consideration |
| **Executive Officers** | | | | | | | | | | |
| William S. Marth | 188,188 | 17.65 | 771,571 | 44,993 | 978,598 | 135,884 | 2,955,477 | 83,452 | 1,815,081 | 6,520,727 |
| Milton Boyer | 58,920 | 17.39 | 256,891 | 8,765 | 190,639 | 16,276 | 354,003 | 14,368 | 312,504 | 1,114,037 |
| Christopher M. Conway | 109,949 | 11.28 | 1,151,166 | 7,845 | 170,629 | 15,932 | 346,521 | 9,420 | 204,885 | 1,873,201 |

| Name | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Margalit Fine | 21,725 | 18.41 | 72,562 | 4,413 | 95,983 | 21,624 | 470,322 | — | — | 638,867 |
| Steven R. Hagen, Ph.D. | 107,331 | 13.88 | 844,695 | 9,720 | 211,410 | 18,956 | 412,293 | 10,958 | 238,337 | 1,706,735 |
| Lori M. Henderson | 249,752 | 10.26 | 2,869,650 | 13,745 | 298,954 | 26,176 | 569,328 | 13,514 | 293,930 | 4,031,862 |
| Felicia I. Ladin | 172,478 | 17.03 | 814,096 | 14,678 | 319,247 | 28,060 | 610,305 | 19,118 | 415,817 | 2,159,465 |
| George Svokos | 247,208 | 13.61 | 2,012,273 | 18,439 | 401,048 | 35,716 | 776,823 | 15,941 | 346,717 | 3,536,861 |
| **Non-Employee Directors** | | | | | | | | | | |
| Thomas E. D'Ambra, Ph.D. | 129,980 | 7.27 | 1,882,110 | 3,802 | 82,694 | | | 99,207 | 2,157,752 | 4,122,556 |
| David H. Deming | 9,358 | 18.41 | 31,256 | 3,802 | 82,694 | — | — | — | — | 113,950 |
| Gerardo Gutiérrez | 15,898 | 17.32 | 70,428 | 3,802 | 82,694 | — | — | — | — | 153,122 |
| Kenneth P. Hagen | 9,358 | 18.41 | 31,256 | 3,802 | 82,694 | — | — | — | — | 113,950 |
| Anthony J. Maddaluna | 15,898 | 17.32 | 70,428 | 3,802 | 82,694 | — | — | — | — | 153,122 |
| Fernando Napolitano | 9,358 | 18.41 | 31,256 | 3,802 | 82,694 | — | — | — | — | 113,950 |
| Kevin O'Connor | 92,347 | 9.57 | 1,124,786 | 3,802 | 82,694 | — | — | — | — | 1,207,480 |

43.      Meanwhile, AMRI's management stood to receive millions more in "golden parachute" benefits that would not be available absent a sale.  The Company's CEO, William S. Marth, alone stood to receive a total of more than $9.2 million in golden parachute benefits – more than doubling what he would have earned solely from his shares in the Company.  Below is a table setting forth the value of these benefits for each of AMRI's officers.

| Name | Cash ($) | Equity ($) | Perquisites/ Benefits ($) | Total ($) |
|---|---|---|---|---|
| William Marth | 2,788,788 | 6,440,101 | 38,520 | 9,267,409 |
| Felicia I. Ladin | 1,103,473 | 1,877,620 | 25,817 | 3,006,910 |
| Lori M. Henderson | 1,077,631 | 1,576,698 | 31,125 | 2,685,454 |
| Steven R. Hagen | 1,001,396 | 1,171,936 | 31,125 | 2,204,457 |
| George Svokos | 1,297,292 | 2,030,743 | 31,125 | 3,359,160 |

44.      In addition, the officers and directors stood to receive over $132 million from the sale of their otherwise-illiquid Company shares.  Below is a table setting forth the number of shares held by each of AMRI's officers and directors.

| Name and Address of Beneficial Owner | Shares Beneficially Owned | |
|---|---|---|
| | Number | Percent |
| **Named Executive Officer** | | |
| William S. Marth | 421,694 | * |

| | | |
|---|---:|---:|
| Felicia I. Ladin | 84,809 | * |
| Lori M. Henderson | 200,127 | * |
| Steven R. Hagen, Ph.D. | 67,682 | * |
| George Svokos | 227,417 | * |
| **Directors** | | |
| Thomas E. D'Ambra, Ph.D. | 2,594,909 | 6.0% |
| David H. Deming | 3,036 | * |
| Gerardo Gutiérrez | 2,209,394 | 5.1% |
| Kenneth P. Hagen | 3,036 | * |
| Anthony J. Maddaluna | 13,948 | * |
| Fernando Napolitano | — | * |
| Kevin O'Connor | 137,462 | * |
| All executive officers and directors as a group (fifteen persons) | 6,086,941 | 13.9% |

45.     In the same vein, Lauro Cinquantasette S.p.A. – which appointed director Fernando Napolitano to the Board – stood to receive over $153 million from the sale of its own otherwise-illiquid Company shares.

46.     Lest there be any doubt that these incentives could create conflicts of interest with the Company's public stockholders, the Board itself explicitly recognized, according to the Proxy Statement, that there was a "potential for conflicts of interest with our management as well as with our significant stockholders who have board representation," especially "in the context of a potential sale to a financial sponsor."  While the Board created a purportedly independent Special Committee to address these conflicts of interest, the conflicted members of the Board remained involved throughout the process, and indeed at least four of the eight directors who ultimately voted to approve the Merger suffered from these conflicts of interest.

47.     Even the purportedly independent directors who served on the Special Committee were not truly disinterested and independent with respect to the Merger.  The amounts they stood to receive as a result of accelerated vesting of their incentive awards gave each of these directors a personal reason to favor locking up a sale over alternatives that might be more favorable to public stockholders.  Likewise, the members of the Special Committee each received so-called "special bonus payments" for their efforts regarding the Merger.  The value of these benefits was material

to each director because, as shown below, these payments were larger than each director's 2016 director compensation, which, in turn, was material enough to the director to induce that director to serve on the Board.

| Special Committee Member | Value of Cash Award and Restricted Stock | Special Bonus Payments | Total Acquisition-Related Benefits | 2016 Director Compensation |
|---|---|---|---|---|
| Deming (Chair) | $113,950 | $50,000 | $163,950 | $70,000 |
| O'Connor | $1,207,480 | $25,000 | $1,232,480 | $157,500 |
| Hagen | $113,950 | $25,000 | $138,950 | $55,000 |
| Maddaluna | $153,122 | $25,000 | $178,122 | $135,000 |

48.     In addition, the Board retained a financial advisor, Credit Suisse Securities (USA) LLC ("Credit Suisse"), that was incapable of rendering an impartial opinion on the Merger because of its own conflicts of interest, including lucrative relationships with both of the acquirors, who Credit Suisse had convinced the Board to partner up with in connection with the Merger.  In the two years preceding the Merger, Credit Suisse had received $55 million in fees from Carlyle and $20 million from GTCR.  Given those substantial relationships and the fact that Carlyle and GTCR are, in the Proxy Statement's words, "highly experienced, serial acquirors of public companies," Credit Suisse had every incentive to guide the sales process in a way that accomplished Carlyle's and GTCR's goals, which is exactly what Credit Suisse ultimately did.

49.     In addition, Credit Suisse was incentivized by the terms of its engagement to advise the Board that the Merger was fair to common stockholders.  Credit Suisse was entitled to receive a $16 million fee that was entirely contingent – first on Credit Suisse rendering an opinion that the Merger was fair to common stockholders and second on the Merger being consummated.

50.     Moreover, while AMRI's stockholders were cut out of the picture, the Company's management stayed on board after the transaction, even as they cashed in their illiquid holdings for lucrative payouts.  Indeed, the press release announcing the completion of the Merger confirmed that "President and Chief Executive Officer William S. Marth will continue to lead AMRI," and the Company's website shows that other members of management have also remained in their positions.  Consequently, in being retained by the Buyer Defendants, AMRI's management

got the best of both worlds: they received substantial Merger-related payoffs and were allowed to remain in their positions without being subject to the hassles and filing requirements of running a publicly traded company.

**The Conflict-Driven Sales Process**

51.     On May 9, 2017, AMRI announced its financial results for the first quarter of 2017. In a conference call that day with investors and analysts, defendant Marth stressed that the Company was "positioned well to deliver an excellent year," having "exceeded [its] revenue and profitability expectations" for the quarter. The Company reported total revenue of $164 million, an increase of 55% from the first quarter of 2016, adjusted EBITDA of $24 million, an increase of 83% from the first quarter of 2016, and non-GAAP earnings per share of $0.13, double the prior year.

52.     Nonetheless, driven by their personal interests in a lucrative payday, which they would not receive if the Company simply remained independent and satisfied any capital needs to fund its continued growth through straightforward financings, the Board opted to sell the Company. Indeed, in 2016 and early 2017, the Company was apparently approached, on an unsolicited basis, by three different private equity firms who expressed interest in a potential financing transaction with AMRI. While that type of transaction would have been in the public stockholders' interest, allowing them to continue participating in the Company's growth, it would not have unlocked the valuable benefits for AMRI's officers and directors that are described above. AMRI's officers and directors opted for the more personally profitable path.

53.     Even apart from the decision to sell the Company, the Board and AMRI management continued making apparently self-interested decisions that benefited themselves at the expense of the Company's public stockholders. Most notably, the financial sponsor referred to in the Proxy Statement as "Party G" contacted the Company on April 4, 2017, well before the

Company ultimately agreed to the Merger.  No effort was made to include Party G in the process. Instead, Credit Suisse actively put Party G off, telling it that "the Special Committee was in advanced discussions with several parties and that Party G would be contacted if things changed." On May 24, 2017, GTCR submitted a proposal to acquire the Company for $21.25 per share, which provided for a portion of the equity financing to be provided by certain of GTCR's limited partners. The same day, Party G submitted an indication of interest in acquiring the Company for $20.00 per share.  The next day, Carlyle submitted a proposal to acquire the Company for $18.50 per share, which indicated that Carlyle would seek the participation of another equity partner to fund half of the equity investment.  Nonetheless, the Board continued negotiating with Carlyle and GTCR while essentially giving Party G the cold shoulder.

54.    Even after Party G increased its bid to $22.00 per share, on May 27, 2017, the Board did not give Party G a chance to acquire the Company.  Instead, facing a situation where Carlyle and GTCR were offering $21.00 and $21.50 per share, respectively, and both bidders wanted equity partners to join their bids, with GTCR indicating that certain of its limited partners could co-invest with it, the Board apparently lost patience with the process.

55.    Despite the lack of any apparent reason for urgency from the stockholders' perspective, the members of the Board opted not to take the obvious, price-maximizing strategy, but instead to take the one that best suited their own interests.  Well-motivated fiduciaries would have allowed GTCR's limited partners the time they had requested to complete due diligence so they could join GTCR's bid, and at the same time given Party G the time and opportunity to partner with Carlyle so as to submit a bid that could compete with GTCR's bid.  This obvious path would have solved GTCR's and Carlyle's professed needs for co-investors while maintaining the competitive tension that was necessary to maximize the price for AMRI stockholders.  A partnership with Carlyle also would have addressed the Special Committee's purported concern

(based on conflicted advice from Credit Suisse) about Party G's "relative inexperience in evaluating, negotiating and consummating transactions of this size and nature or within our industry," and its lack of a "similar profile and experience" to Carlyle and GTCR.  Instead, the Board members pursued the path that guaranteed them the immediate opportunity to cash in their benefits, guided by a financial advisor that had a strong interest in appeasing both Carlyle and GTCR and in not pressing them, through a competitive process, to pay the highest possible price for AMRI stockholders.

56.     On June 3, 2017, Party G increased its offer to $22.50 per share and indicated that, even working without a partner, it would be prepared to sign and announce a transaction within two to three weeks of receiving full access to all of AMRI's confidential information.  Nonetheless, that very same day, apparently driven by their own selfish interests, Board members permitted Carlyle and GTCR to stop competing against each other and instead to join together to acquire the Company for $21.75 per share.  On June 5, 2017, the parties signed the Merger Agreement and, on June 6, 2017, they announced it.

**The Company's Expected Growth to Billion-Dollar Revenues**

57.     Before the Merger, the Company was on a promising path towards significant growth, as favorable industry trends combined with the Company's strategy to create exciting opportunities.  In June 2016, at the Jefferies Healthcare Conference, defendant Marth explained the Company's "Strategy to Achieve $1B in Revenues in 2018."  Because his audience included current and potential investors, Marth had every incentive to be realistic and honest in articulating his expectations for the Company – in the absence of a sale, investors and the Board would evaluate Marth's performance, compensation and retention or dismissal based on whether the Company achieved these expectations.  Accordingly, this presentation reflected the honest expectations of

Marth and the other Individual Defendants.  By May 2017, the Company was in fact exceeding its own expectations, as noted above.

58.     As recently as May 31, 2017, *i.e.*, less than a week before the Board approved the Merger, the Company told investors that it was still "[t]argeting a run rate of $1B in revenues in 2018" and had a 3 to 5 year target of "$1B+ of revenues," as the Company becomes a "top tier global CDMO."   These expectations were supported by several objective facts of which the Individual Defendants were aware, including the fact that the Company had achieved a compound annual growth rate of 31% in revenue from 2013 to 2017, the fact that AMRI was a top-ten contract development and manufacturing organization (or CDMO) with a $140 billion addressable market, and the fact that AMRI was a leading global player in High Potency Active Pharmaceutical Ingredients ("API"), with global High Potency API revenue projected to double from 2015 to 2020.

59.     Again, the Individual Defendants had every incentive to be realistic and honest in articulating their expectations in this May 2017 presentation, because their compensation, retention or dismissal would depend on their achieving those expectations, in the absence of a sale. Accordingly, these statements reflected the Individual Defendants' honest expectations for the Company's revenues.

**The Proxy Statement Disclosed Materially False Financial Projections**

60.     On July 14, 2017, defendants caused AMRI to file with the SEC its definitive Proxy Statement.  The Proxy Statement recommended that stockholders vote to approve the Merger Agreement at a special meeting of stockholders that was to be held on August 18, 2017.

61.     In contrast to the Company's actual expected growth, the financial projections that were disclosed and relied upon in the Proxy Statement were falsely pessimistic.  Those projections were described as "financial projections for fiscal years 2017 through 2021 as prepared by our

management and provided to our board in their evaluation of the merger agreement and to Credit Suisse for its use and reliance in connection with preparing its financial analyses and opinion to the board as described above under the heading '– *Opinion of AMRI's Financial Advisor*.'"  The Proxy Statement represented to stockholders that the projections were "based on [AMRI's] long-range plan."

62.    Contrary to the Company's and Individual Defendants' true expectations, and to AMRI's actual long-range plan, however, and even though the projection period's terminal year was after 2021, the disclosed projections ***never*** reach $1 billion in revenue.  The projections that were disclosed and relied upon in the Proxy Statement were as follows (in millions):

|  | **Management Projections** | | | | | **Normalized Terminal Year** |
|---|---|---|---|---|---|---|
|  | **2017E** | **2018E** | **2019E** | **2020E** | **2021E** | |
| Total Revenue | 730 | 804 | 875 | 921 | 972 | 960 |
| Adjusted EBIT (Excluding Share-Based Compensation) | 99 | 130 | 164 | 178 | 204 | 191 |
| Adjusted EBITDA | 140 | 171 | 206 | 222 | 248 | 236 |
| Unlevered Free Cash Flow | 37 | 65 | 86 | 108 | 127 | 119 |

63.    As the table above shows, the disclosed projections peaked at $972 million in revenue in 2021, with a "normalized terminal year" of $960 million.  These projections were materially different than management's true expectation that the Company would reach a run rate of $1 billion in revenue by 2018, and revenues over $1 billion in the next 3 to 5 years.

64.    Meanwhile, in its discounted cash flow valuation analysis, Credit Suisse used long-term growth rates for the Company of only 2% to 3%.  These rates are much lower than overall market growth, implying that AMRI would lose market share even though it considered itself a top-ten CDMO and intended to be a "top tier global CDMO" in the long term.

65.    These discrepancies indicate that the projections and financial analyses disclosed in the Proxy Statement were deliberately manipulated to make the Merger appear more favorable, relative to remaining independent, than it truly was.  As explained above, the Individual

Defendants had consistently told investors that the Company would reach a run rate of $1 billion in revenue by 2018, and revenues over $1 billion in the next 3 to 5 years. The Individual Defendants had said this in a context where their livelihoods and incomes depended on their meeting their targets, making it clear that those targets reflected the Individual Defendants' true expectations.

66.     When the Individual Defendants' incentives changed, however, and they stood to receive large payments only if they could convince public investors that the Company's standalone prospects were less attractive than the Merger, their story also changed. All of a sudden, with no future accountability to public investors as to the accuracy of their projections, the Individual Defendants concealed their true expectations and falsely told investors that their "long-range plan" was for the Company to earn less than $1 billion in revenue for the foreseeable future. Apart from the change in incentives, there was no intervening change in the objective facts that the Individual Defendants had cited in support of their true, billion-dollar expectations. Because the projections did not represent either the Individual Defendants' true expectations or the Company's true prospects, they were materially misleading.

67.     The Individual Defendants' manipulations of AMRI's financial projections enabled Credit Suisse to opine that the $21.75 per share Merger consideration was fair to AMRI stockholders. In turn, the manipulations induced AMRI stockholders to approve the Merger, which they did at the August 18, 2017 special stockholders' meeting. The Merger closed on August 31, 2017.

**The Merger Price Was Unfair to AMRI Stockholders**

68.     As a result of the unfair process summarized above, and even setting aside the fact that stockholders would have been better off had the Company not been sold at all, the price offered in the Merger was unfair.

69.     The Company's shares traded as high as $23.95 per share in November 2014 and, as analysts at William Blair explained,  the Merger's implied multiple of 13.7  times trailing 12-month EBITDA was a significant discount to the 17.2 times multiple Thermo Fisher had recently paid for comparable firm Patheon, just as the implied multiple of 11.5 times analysts' 2017 EBITDA estimate was a discount to the average 14.6 times multiple at which other publicly traded CDMOs were trading.

70.     In addition, Party G was willing to acquire the Company for $22.50 per share.  If the Board and Credit Suisse had been well motivated, they would have forced Carlyle and GTCR to compete against each other, after pairing them with others as discussed above, and most likely would have elicited offers higher than what Party G was willing to pay on its own.  Instead, the Individual Defendants sold out the public stockholders at significantly less than fair value, so they could net their own payday.

**Other Material Omissions from the Proxy Statement**

71.     Even setting aside the misrepresentations described above, defendants also omitted several other pieces of material information from the Proxy Statement.  This includes information about the sales process and the conflicts of interest affecting the Company's directors and officers, information about the financial projections that were disclosed, and information about Credit Suisse's relationships with the parties involved in the Merger.

72.     ***First,*** the Proxy Statement omitted material information about the process leading to the Merger that was necessary to make the information that was disclosed not misleading.  For example, the Proxy Statement reported that the Company entered into confidentiality agreements with several parties, and for nearly all of those parties it described the confidentiality agreement as having "allow[ed] [the counterparty] to make confidential proposals to us at any time after the public announcement by AMRI of a transaction."   In describing the confidentiality agreement

between AMRI and "Party D," however, the Proxy Statement simply described the agreement as "customary," without telling stockholders whether it allowed Party D to make a proposal to AMRI after AMRI announced the Merger.

73.    By omitting this information, the Proxy Statement left stockholders materially uninformed as to whether Party D could have submitted a proposal that was superior to the Merger Agreement after the Merger Agreement was announced.  While it appears that Party D was not free to submit such a proposal, the Proxy Statement's failure to disclose the contractual restrictions applicable to Party D made the Proxy Statement misleading.  For example, the description of Party D's confidentiality agreement as "customary" was misleading because, given the description of every other confidentiality agreement, it misled stockholders into believing that the agreement allowed Party D to submit proposals after the announcement of a transaction.  Likewise, the failure to disclose the contractual restrictions on Party D's ability to submit proposals made misleading the Proxy Statement's representation that one of the reasons to approve the Merger Agreement was that the Merger Agreement "would not preclude a superior proposal."

74.    *Second,* the Proxy Statement excluded from its disclosure of the fees that Credit Suisse earned from Carlyle and GTCR the fees that Credit Suisse earned from having served as a "lender[] to members of Carlyle and/or GTCR."  Omission of these fees made materially misleading the Proxy Statement's disclosure that Credit Suisse had earned $55 million from working for Carlyle and $20 million from working for GTCR.  A reasonable stockholder would understand those disclosed fees to include all fees Credit Suisse had earned from Carlyle and GTCR affiliates during the relevant period, but in reality the undisclosed fees earned from "members of Carlyle and/or GTCR" would be similarly significant in Credit Suisse's assessment of the value of its relationship with Carlyle and GTCR.

75.    **Third**, separate and apart from the fact that the disclosed projections themselves were materially misleading, the Proxy Statement omitted material information about those projections.  Stockholders could not fully understand the projections, Credit Suisse's financial analyses, or the relative attractiveness of the Merger, because the Proxy Statement did not disclose the risk-adjusted and non-risk adjusted financial projections provided by AMRI's management, and relied upon by Credit Suisse for purposes of its analysis, for fiscal years 2017 to 2021, for the following items:

(a)    Revenue by product/service type;

(b)    Gross margin by product/service type;

(c)    Changes in net working capital;

(d)    Capital expenditures;

(e)    Stock-based compensation expense; and

(f)    Any other adjustments to unlevered free cash flow.

76.    **Fourth**, the Proxy Statement's disclosure of Credit Suisse's financial analysis was also materially incomplete because it omitted material information pertaining to the analysis.  With respect to Credit Suisse's "Selected Companies Analysis," for example, the Proxy Statement failed to disclose whether Credit Suisse performed any type of benchmarking analysis for AMRI in relation to the selected public companies and, if it did, it failed to provide a fair summary of that analysis.  With respect to Credit Suisse's "Discounted Cash Flow Analysis," the Proxy Statement failed to disclose:  (i) the individual inputs and assumptions used by Credit Suisse to derive the perpetuity growth rate range of 2% to 3%; (ii) AMRI's net debt used by Credit Suisse in the analysis; (iii) the implied terminal EBITDA resulting from the analysis; and (iv) how, if at all, Credit Suisse incorporated AMRI's net operating loss assets in its analysis.  By omitting these facts from the Proxy Statement, the Individual Defendants improperly touted their financial

advisor's analysis as supporting approval of the Merger while failing to provide material information about the valuation methods and key inputs used to arrive at that opinion.

## COUNT I

### For Violations of §14(a) of the 1934 Act
### and SEC Rule 14a-9 Promulgated Thereunder
### Against All Defendants

77.    Plaintiff repeats and realleges the allegations contained above in ¶¶1-76, as if fully set forth herein.

78.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the 1934 Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

79.    Defendants prepared, reviewed and/or disseminated the false and misleading Proxy Statement that failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.    As stated herein, the Proxy Statement contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, which Proxy Statement was an essential link in the consummation of the Merger.  The defendants also failed to correct the Proxy Statement and the failure to update and correct false statements is also a violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

81.     The written communications made by the defendants described herein constitute violations of Rule 14a-9 and §14(a) of the 1934 Act because such communications are materially false and/or misleading and were provided in at least a negligent manner.

82.     As a direct result of the defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy Statement, plaintiff and the Class were precluded from exercising their right to seek appraisal and were induced to vote their shares and accept the inadequate consideration of $21.75 per share in connection with the Merger. The false and/or misleading Proxy Statement used to obtain stockholder approval of the Merger deprived plaintiff and the Class of their right to a fully informed stockholder vote in connection therewith and the full and fair value of their AMRI shares. At all times relevant to the dissemination of the materially false and/or misleading Proxy Statement, defendants were aware of and/or had access to the true facts concerning AMRI's anticipated growth, which was not reflected in the management projections that were disclosed in the Proxy Statement, and as a result were aware that AMRI's true value was materially higher than indicated in Credit Suisse's financial analyses based on those projections and materially higher than the $21.75 per share that AMRI's stockholders received in the Merger. Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy Statement defendants used to obtain stockholder approval of and thereby consummate the Merger, plaintiff and the Class have suffered damage and actual economic losses (*i.e.*, the difference between the price AMRI stockholders received and AMRI's true value at the time of the Merger) in an amount to be determined at trial.

83.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure

as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

84.    By reason of the misconduct detailed herein, the defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants and the Buyer Defendants

85.    Plaintiff repeats and realleges the allegations contained above in ¶¶1-84, as if fully set forth herein.

86.    The Individual Defendants acted as controlling persons of AMRI within the meaning of §20(a) of the 1934 Act. By virtue of their positions as officers and/or directors and/or controlling shareholders of AMRI, and/or their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements plaintiff contends are false and misleading.

87.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.    The Proxy Statement details the Individual Defendants' involvement in negotiating, reviewing and approving the Merger and in the preparation of the Proxy Statement and contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were thus directly involved in the making of this document.

89.    The Buyer Defendants are controlling persons of AMRI and the Individual Defendants within the meaning of §20(a) of the 1934 Act.  The Buyer Defendants possessed control over AMRI and the Individual Defendants by reason of their contractual rights and obligations under the Merger Agreement:

(a)    AMRI and the Individual Defendants were required by §6.01 of the Merger Agreement to refrain from changing the operation of the Company's business or engaging in a variety of activities without the express written consent of the Buyer Defendants;

(b)    Pursuant to §6.04(b) of the Merger Agreement, AMRI was required to consult with the Buyer Defendants before setting the record date for the stockholder meeting on the Merger; and

(c)    Pursuant to §6.04(a) of the Merger Agreement, the Buyer Defendants were required to, and did, "cooperate . . . with the Company in connection with the preparation and filing of the Proxy Statement, including promptly furnishing to the Company in writing upon request any and all information relating to [the Buyer Defendants] as may be required to be set forth in the Proxy Statement under Applicable Law."  The Buyer Defendants also promised to

> ensure that such information supplied by [them] in writing for inclusion in the Proxy Statement will not, on the date it is first mailed to stockholders of the Company and at the time of the Stockholder Meeting or filed with the SEC (as applicable), contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

The Buyer Defendants also explicitly required that, "prior to filing or mailing the Proxy Statement (or any amendment or supplement thereto), or responding to any comments of the SEC with respect thereto, the Company shall provide Parent with a reasonable opportunity to review and comment on such document or response and shall consider Parent's comments in good faith."

90.     By reason of such conduct, the Individual Defendants and the Buyer Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Declaring that the Proxy Statement distributed by defendants to stockholders was materially false and misleading in violation of SEC Rule 14a-9 and §14(a) of the 1934 Act;

C.     Awarding plaintiff and the members of the Class compensatory and/or rescissory damages against the defendants;

D.     Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

E.     Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  October 23, 2017

**BOIES SCHILLER FLEXNER LLP**

_[signature]_

Adam R. Shaw (Bar Roll No. 502142)
30 South Pearl Street, 11th Floor
Albany, NY 12207
Telephone: 518-434-0600
Facsimile: 518-434-0665
Email: ashaw@bsfllp.com

Damien J. Marshall
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: 212-446-2300
Facsimile: 212-446-2350
Email: dmarshall@bsfllp.com

ROBBINS GELLER RUDMAN
     & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
     & DOWD LLP
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dwissbroecker@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER H. LYONS
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
clyons@rgrdlaw.com

Attorneys for Plaintiff